This is taken under advisement and we'll turn to the next case, the United States v. Moreno. Mr. Prusetsky. Just good afternoon, Your Honor. Please the court, counsel. Maria Moreno did not conspire to sell drugs with the Guzman organization. Maria Moreno's relationship with the Guzman's DTO was of a strict buyer-seller relationship and nothing more. The district court judge should have granted Maria Moreno's motion for a directed finding at the close of the government's case, and certainly Maria's motion based on Rule 29 at the conclusion of the case. This court recently said in U.S. v. Garcia, the height of the hurdle to survive a challenge seeking a judgment of acquittal depends directly on the strength of the government's evidence. And in Brown, Johnson, and Polgar, this court held that in a drug distribution conspiracy case, a conviction will be overturned when the possibility of a buyer-seller relationship is the same as that of a conspiracy. This case should not have reached the jury because the evidence presented by the government was of insufficient caliber and quantity to allow a rational finder of fact to find that a conspiracy existed. This is the quintessential case of a buyer-seller. Even after the government had to flip-flop its theory between their opening statement and closing arguments, where in opening the government told the jury that Maria worked for a drug trafficking organization and that this case is about a group of people who work together to distribute heroin and the defendant is a member of that organization. That is a quote from the record. But in its closings, Your Honor, the government had adjusted its theory. The government realized that during the trial, and as Torres was testifying, that Maria's relationship with the Guzman's DTO was nothing more than that of a buyer and a seller. And so they said that, they argued to the jury, Maria was not a member of the Guzman organization. She didn't know these people. She never hung out at the stash houses. She didn't know Mr. Sanchez or Mr. Guzman. She wasn't a member. She wasn't paid by them. And again, that is a quote from their closing argument, a complete contradiction to its opening argument. The government then stated that the important question was, did she conspire with the Guzman organization to distribute heroin? Although that is actually the true question in a conspiracy case, here there is zero evidence to support that conviction. More specifically, the government did not present any evidence that an agreement to distribute the drugs existed and went beyond the agreement to complete the underlying drug deals. None of the factors, through circumstantial or direct evidence, that this court required to establish a conspiracy over a buyer-seller relationship exists in this case. These factors are multiple large drug quantity purchases. Standing alone, as this court has repeatedly said, is not enough to establish a conspiracy, which is exactly what we have in this case. The government says that there were sales on credit. The government did not present any evidence that the sales were on consignment, but they argued that there were sales on credit. There were none. In fact, the delivery procedure, a term the government used repeatedly in its brief, was established specifically because of the lack of trust, lack of cooperation, and lack of mutual goals between Maria Moreno and the DTO. The delivery procedure was not a sale on credit by any mean. In Chicago, the money came first, and then the drugs. Then they had to switch it to Detroit, where the procedure was simply flip-flopped. The government's argument that the Detroit procedure, specifically on July 16, 2013, was somehow different than the Chicago one and was really a sale on credit makes no sense. They first say, or make the argument regarding the text message, down here with my money, but they fail to tell the court that it was followed just moments later with another text from the same phone number that says, quote, everything okay, mom? Worried. Call me. Tell me something. This second text message tells us that the person waiting with the money was Maria's own child, and that he's worried because they don't trust Foster and the DTO. Secondly, Your Honors, is that the text itself is truly a red herring in a way. The government did not introduce any evidence at trial, direct or circumstantial, that Maria was not going to take the car with the drugs and return it with the money just as she has done before. In fact, the government introduced a phone call the day before where Torres testified that in preparation for the July 16 delivery, he specifically spoke to Maria Moreno to make sure that she was ready with the money and she told him that she is. No reasonable jury could have concluded that this text message really meant that the DTO agreed to front drugs to Maria and wait for the payment later. Next, the government argues that because Foster rented a room, there had to be an agreement on sale for credit. Ladies, Your Honors, this is actually negated by the government's prior argument regarding the text message, down here with my money. That shows that Maria was ready and able to pay according to their well-established procedure. In fact, Maria was arrested by Foster's SUV as she was ready to leave to get the money and bring it back. And finally, the government argues that Torres testified that there was a single occasion where Maria delivered the money later. But he did not remember any details about it. Even if it happened, and let's assume it did happen, this was the odd exception. As this court said in Pulgar, similar situation, this court held that there needs to be proof of repeated fronting, not just singular, unspecified, vague occurrence that did not and could not have turned this relationship into a trusted conspiracy. The next factor is an agreement toward future threats of each other's business and competitors or law enforcement. The government argues that the single phone call Maria made to Torres after she was stopped in Indiana was an indication of agreement to warn each other. Not so. This was a single, isolated occasion. There was no agreement to warn each other. Maria, in a mode of self-preservation, called Torres to tell him to drop the phone. Maria was only worried about herself. I think the challenge for you is when you combine it all. I think that's the way Judge Dow's analysis proceeded, in the sense that you have at least the one instance of the credit transaction, because the jury was entitled to credit the Torres testimony. The phone call happened, and then you have the sharing of these vehicles in the way that they did. So when you add it all together, isn't that what's of most concern? With due respect, Your Honor, no. And I'll start with the end. There was no sharing of a vehicle. I think the sharing of a vehicle was misconstrued by the court and is argued by the government in a way that it did not happen. The point was that the trailblazer wasn't hers. It was somebody else's. I don't know who it was registered to. But that window got popped out, and it was Torres or somebody that repaired the thing. But that vehicle, and on page trial transcript 396, Torres testified that that vehicle specifically was never used. That car was never used by the drug organization or Maria Moreno to transfer drugs or money. That vehicle was a completely unrelated vehicle to any of, it was parked on the streets. It had a drug trapped in it. But that vehicle was never used by, there's no evidence that that vehicle was ever used by either organization to conduct a drug deal. In fact, Torres testified that Maria was also a customer of another individual. I believe it was somebody's brother, Mr. Andres. There was no evidence in the record that that vehicle was used, and actually it's contrary. That vehicle was not used. The only vehicle... Was there evidence of who the vehicle was registered to? Who owned the vehicle? I don't believe so. It might be registered to Maria Moreno's cousin, but I'm not sure if it's in the record, Your Honor. I don't know. And the fact that there was a singular call and a singular event of possible credit sale, just like in Johnson, this court held that like the one-time possible credit sale, the singular warning is insufficient to establish the existence of a conspiracy. I see my time is done. You used your rebuttal, but I'll give you two minutes. Thank you, Your Honor. All right. Ms. Greenwald. May it please the Court. The defendant's argument ignores this Court's directive that the evidence must be viewed holistically and in totality and not in isolation bit by bit, and when the evidence here is viewed holistically and in the light most favorable to the verdict, the evidence supporting the defendant's conviction for narcotics conspiracy was ample. First, there was evidence upfronting. In addition to Mr. Torres' testimony that over the course of a year, he recalled one specific incidence upfronting. There was the July 16, 2013, undercover essential delivery, completion of a delivery. When the inferences are taken in favor of the verdict, that evidence is ample to support fronting on that occasion. Multiple kilos of heroin were being delivered. The defendant showed up without any money on her person, in her vehicle. She had, in prior conversations that are part of the recording discussed in our brief, particularly transcript July 15, 2013, at 9.33 p.m. She's arranging, saying that the heroin needed to arrive by 9 o'clock. It would be too difficult to deal with after 9 o'clock. What's going on? We know what's going on because while she's in custody, after she's arrested, there's a text to her phone saying, I'm here with the money. With my money. Not her money. My money. Now, defendant's now saying it was the son making this call. At trial, interestingly enough, I went back and was reading through the record in light of his reply brief, and in that record, he suggests that it was actually a call from her mother. That the mother was saying that she was there with the money. It doesn't matter. It could have been her mother. It could have been her brother. They're showing up with money to purchase drugs. It was a reasonable inference that Maria, the defendant, did not have that money. This wasn't a matter of transferring money. This was a matter of selling the drugs to get it. It's a reasonable inference, and this is viewed in the light most favorable to the verdict. In addition, there is evidence that supports, again, a reasonable inference that this happened earlier in June when the exact same thing. Foster was delivering the heroin to her. He stayed overnight in a hotel. It's reasonable to think he wasn't staying overnight in that hotel with multiple kilos of heroin worth over $200,000. That, again, the same thing was happening. He was waiting for her to go sell these drugs. In fact, the evidence reasonably supports the inference in favor of the verdict that now that the heroin was being brought to Detroit, that, in fact, fronting was becoming more of a routine. And fronting didn't happen in this. The one thing Mr. Torres' testimony is very clear about is nothing happened in this organization, particularly not fronting without the permission and the direction from Guzman, who Torres had been. There's evidence showing he was in phone conversations between Torres and Guzman whose phones were tapped prior to this delivery to the defendant. So there was ample evidence of fronting in this case. But there's more than that because, again, it can't be looked at bit by bit. There's the warning as well. In this case, it's not like the Johnson case where the warning happens when, in Johnson, relied on by the defendant, they were going to meet to do the sale and the defendant gives a warning, don't come to the meet, we're being looked at. There's no sale going on at that moment. What happens is she's leaving to return to Detroit in this vehicle and the registration is in the record. We don't know who this person is, but it's some person who lives in the Detroit area not far, actually, and this is in the record too, far from the hotel that the deal later goes down in. But in any event, she is stopped. They take the vehicle because she's not the registered owner and she, in the course of calling Torres to set up the deal when she's going to go back and get the heroin from him in Chicago before they stop and start going to Detroit, she says to him, and get rid of your phone. Get rid of your phone. This is well before their next deal is going to happen. Get rid of that phone. Surely she's protecting herself, but she's also protecting this organization that she's working collaboratively with, that she's sharing vehicles with trapped cars in that they're getting fixed for her with so that their business is not disruptive and their collaboration is not disrupted. Again, if she was just looking to preserve herself, she might just not have anything to do with them anymore. In fact, she says in the recorded conversation she has with Torres, basically, I was followed from when I got that truck from you. So she could be concerned that she's bringing tea to Torres and the Guzman organization and she doesn't want to get in trouble with them. So her warning them kind of goes to their trust that we're in this together. You don't have to worry I'm betraying you. I don't have to worry you're betraying me. And again, viewed in the light most favorable to the verdict in all inferences therefrom, it amply supports that you had not just fronting here on some occasions within the course of a year and warning within the course of a year. And then in addition there was sharing of the vehicles. Again, I'm not, I do not recall, and I could be mistaken, but I do not recall Mr. Torres testifying that this vehicle was never used. And I believe in our brief I have citations from, again, I could be mistaken, I haven't gone back and read that part of the record, but I certainly suggest in the brief that it was used. And certainly the trap in the car lends itself to that interpretation. But in addition, Mr. Foster's truck at that deal in Detroit on the 16th, she's got the key to it. And although she forgets she has the key to it in the car, it's clear from the conversation she was given a key, a control to that car. And while it's the government's position that the evidence supports the belief that she was going to use that vehicle to either take drugs directly and try and sell it with it, or to take it to another place where she would then unload her stuff to then sell and get money from to return to pay for the drugs that were fronted to her. Either way, she's using that vehicle. And so there was evidence, again, in the light most favorable with inferences most favorable supporting that verdict. So when you view all of this evidence in toto, the government would maintain that the evidence amply supports the verdict. And if the court has no... She was only charged with conspiracy to distribute and use of a cell phone and further... Yes, Your Honor. Not with possession. No. If the court has no further questions, we'd ask that her conviction and sentence be approved. Thank you, Ms. Greenwald. I want to talk for a second about the car again. The SUV. There is no evidence on the record at all that that car that was fixed was ever used in any transaction whatsoever. The use of the... The only car that was used, and there was evidence that two cars were really used. One, when she used to come... When Maria Moreno used to come to Chicago and she would come with the money and give it to Torres to take it to the stash house. Torres was asked specifically, why wasn't Maria Moreno met you at the stash house or something to that effect? And he specifically said, and during cross-examination, because she was a customer and we don't let customers go because there's no trust. We're afraid of robberies. In Detroit, the opposite procedure happened and Foster came with the car and Maria Moreno did not meet Foster where the money was because nobody wanted to have... They didn't have the trust to do so. And so it was the opposite procedure in Detroit. I think, again, the government misstates what happened here. Once Maria Moreno received the drugs, the DTO could care less what she did with those drugs and the organization would not give Maria Moreno the drugs before they knew she was ready to pay. So whether or not this text message says, you're down here with my money and she received it from her son or her child because of the text message afterwards or not, that really does not matter because what matters is the phone call the day before where Torres says to her, are you ready with the money the next day to do the deal? And she had to assure him that she is ready with the money. There is no fronting. Thank you. You can make a concluding remark. Okay. So, Your Honor, Guzman did not provide Maria Moreno with cell phones. He had a cell phone store. Guzman did not provide Maria with scales, cutting agents, baggies, other tools to help her distribute the drugs he supplied. Guzman did not allow Maria Moreno to use his stash houses, share clients, even know how the DTO operated. There was no trust between the two and I would ask the court to reverse the conviction and of course count 9 and 11 were tied to that one single count so we would ask for all the counts to be reversed. Thanks to all counsel and Mr. Sposetsky, the additional thanks for accepting this appointment. Judge, if I could ask, what are you talking about? Two additional counts? There was the phone counts. Oh, okay. Thank you. Yes, there were two of them. Have a good weekend. Thank you. Thank you.